Good morning, your honors. May it please the court. My name is Kevin Little, and I am appearing on behalf of the appellant in this case, Desiree Martinez. One of the defendants in this case, your honor, a singer police officer, Angela Yambupa, when asked to characterize the events of the 3rd of June of 2013, the occasion where a obviously beaten, scared woman was left on the street after her abuser, it had been announced that he was going to be arrested, only for the sergeant to say that he was not going to be arrested. She described those occurrences as regrettable. They weren't just regrettable, they were unconstitutional. In this case, the judge, a very good judge who looked at the case very carefully, but even he conceded that he might be construing overly strictly the requirement in a non-accessible force case that you have to have a prior decision on all fours with it. As a matter of fact, more recently, and this is the case that I provided a related case slip to your honors this morning, in the Hernandez v. City of San Jose case, which I think was decided last July, this court made it clear that in the substantive due process context, you do not need a case that is exactly on all fours. It said that you need to have a case in the same context, though. That was crowd control, and so our court didn't think it was enough to just have general background principles about increased danger. That is absolutely correct, your honor, and they relied, I believe, on the Johnson v. Seattle case, the Mardi Gras mob case from about 10 years earlier, as sufficient support. Here we have a much. So what is the case that you think is in the closest context here? The closest case in this context here, your honor, is Okun v. Village of Cornwall. It's a Second Circuit case. It's from 2009. It's the case that the parties grappled with extensively during the transcript of the summary judgment hearing, and it is a case that I will concede to you, having continually updated my research, remains the closest case. So is one case from another circuit enough to make the law clearly established? What is your support for that? Yes, your honor, it is, and with respect to that, I would cite the court to the Perez v. City of Roseville case. It's, I believe, from September of 2018, where this court decided. It's in footnote 9 of that opinion, where the court said that Ninth Circuit case law is, obviously, provides the central guidance, but the court can also look to decisions from other circuits and, indeed, instructive cases, even from at the district court level. But did the court say in that footnote that I don't think we were cited to, if I'm wrong, I apologize if I'm wrong, but I don't remember you citing that before, did it say one case from another circuit is enough? Because my understanding from Sharpe v. City of Orange, by our court in 2017, said that if we're looking outside the circuit, the precedent must be embraced by a consensus of courts outside our jurisdiction. Yes, your honor, and I believe that's also expressed in Moon v. Tice from 2017. And in this case, there are other cases that were cited to the district court. The Watson case, which the court cited in its argument, which was similar, but not the Okin case is almost exactly the same facts. There are other cases where, in the domestic violence context, where the courts have found that officers acted or failed to act, as it were, in a manner that increased the danger to the victim. But the central, clearest, most reliable, most analogous case, I should say, is the Okin. I don't know that Okin is correctly decided, though, so if I feel that way, why would I say it's clearly established? How is a police officer supposed to know that? Well, your honor, Okin is an extension of this court's jurisprudence from the last 30 years, starting with Wood v. Ostrander, where courts have decided in a variety of contexts that where officers, through their actions or in some certain instances, inactions, increase the danger to the injured party. The great. And usually it's where there's no danger, and they create a danger, and that clearly increases it. Ms. Martinez was under danger before the officers ever got there. This is true. And she was under danger afterwards. This is true. And if they had arrested him and released him, she would be under danger. I mean, the context of domestic violence creates a different kind of gloss to this, doesn't it? Because almost, you know, if it was just a failure-to-arrest case, that doesn't really establish it. It's you increase the danger to her. And, you know, I've seen so many cases where I've pleaded with a woman, do not go back to this man. He's going to kill you, and she goes back. And so sometimes what can you do to stop the danger? I have a twofold response to Your Honor's question. First, Your Honor's argument is very similar to the argument that failed to persuade this court in the Hernandez v. City of San Jose case, where it's stated in the court's opinion that, yes, these Trump supporters did face a violence separate and apart from the officers. This angry mob of anti-Trump people. But the court specifically said in that case, nonetheless, the actions of these officers, by sticking to this capricious crowd control plan, despite the fact that they knew that morning there had been attacks, knowing that historically in other locations there had been attacks, and seeing, being firsthand amongst these people and seeing the fear that these supporters had, that that, notwithstanding the fact that the danger was presented by a third party, that was sufficient to support a substantive due process claim. Oh, I don't have a quibble with that. You know, I did those Mardi Gras cases in Seattle where the police were ordered not to intervene. And boy, were they not happy about that. And then somebody gets killed. Understood. But this situation, you know, the policing is horrible. There's no question about that. But was it a clearly established constitutional violation or was it just really poor policing? It was a constitutional violation. And I wanted to address the second point. There are, as I would concede, far too many cases where, unfortunately, victims do not listen to well-meaning officers. And the worst case scenario transpires. Here it's exactly the opposite. We have a woman who is begging these officers, saying, I'm scared of him. He choked me in a hotel room. He beat me. He's going to kill me. And he's obviously subject to arrest. And she wants him arrested.  And that he has guns sends him back in the same house with this gentleman. Why haven't you in your brief distinguished Sanders from Yambupa in terms of liability? It seems like you lump them together, but it seems like they acted pretty differently in that situation. They did act differently, Your Honor. And what I would say regarding Officer Yambupa is this. There's no doubt she was placed in an extremely difficult situation. However, I would liken it to if a supervisor tells an officer to shoot someone when that officer knows it's clearly unreasonable. The officer who pulls the trigger doesn't get a pass just because his supervisor or her supervisor told him to do it. This is the same situation. Officer Yambupa in her deposition, which I think the crucial pages are pages 1172 through 1179, she knows, based on her training, based on what she observed, based on having spoken to all of the parties, that this woman's life was at risk. And instead of taking the action that her knowledge of the law. But failing to arrest isn't enough, right? I mean, just failing to arrest isn't unless you're communicating in some way. I think this is the theory of the Second Circuit. Unless you're actually communicating, you can keep doing this, and we're not going to arrest you. And it seems like Yambupa didn't really communicate that. I think it's Sanders, if anyone, who communicated that. Absolutely. Sergeant Sanders, through his very vocal announcement that this person was going to be arrested and that the Penningtons were good people, certainly. We know that that was Sanders. I thought it just the testimony was the officer said, and I was struggling with what to do with that, this good people line. Actually, I think you're correct. That comes from Ms. Martinez's summary judgment declaration, and it isn't attributed to any specific person. I apologize. With respect to failing to arrest. We don't. We don't, and we would, quite frankly, be guessing. My surmise is that it's him because he's the person who had the longstanding relationship with the Pennington family. But there's nothing necessarily that says it had to have been him. Officer Yambupa, I would just say, however, did not merely fail to arrest. It's mandatory under California law when you do not make an arrest under Penal Code Section 836B to tell that person who you believe is in danger, you have a right to effectuate a citizen's arrest. But we've never said that that was a constitutional violation to not say, to not comply with a state or local ordinance or anything like that. I mean, again, like I say, the policing is very, very poor here. But you're asking the Court to take a Second Circuit case where I happen to agree with Judge McMahon, the trial judge, and there's a Seventh Circuit case that goes a different way and say, and just recently the U.S. Supreme Court in the city of Escondido v. Emmons said, Assuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity. So, you know, the Supreme Court hasn't absolutely agreed that we can even look at Ninth Circuit cases, let alone a single Second Circuit case that we may not agree with. Your Honor, I understand that qualified immunity is a moving target, and most unfortunately the people I represent. But Okun is not a new case. It was not new at the time that these officers came into this situation. And also, with respect to state law, obviously ignoring your state law requirements in and of itself is not a constitutional violation. But as the Court in Okun stated, that also can inform the Court as to whether or not they acted with deliberate indifference. And in this case, not only did Officer Yambupa fail to provide the notice of citizen's arrest that's required under the law, she failed to do the same shift report that is required under Penal Code 13701. She also failed to provide any of the information materials, although she herself said that they were available on scene to Ms. Martinez. So not only did Officer… Did Yambupa do anything that made Martinez worse off than she would have been if Yambupa had never shown up at all? Yes, Your Honor. How? Because, as Officer Yambupa said, based on her training, when a victim reaches out to law enforcement, the danger to her is greater than at any other time. So Ms. Martinez now has reached out to law enforcement, has presented her claim, a very valid one that was believed by the officers, and they sent her back in with someone who had weapons. And that actually made things worse than if they hadn't shown up to the house at all? Yes, Your Honor. And the record shows that when they went back inside, Ms. Martinez was beaten, she was raped, she was sodomized. And then after all of that horror, Mr. Pennington's family comes over and they try to coerce her into giving a false statement to the officers. Okay. Would you like to reserve time for rebuttal? Yes, Your Honor. Thank you. Good morning. May it please the Court. Diana Field representing appellees Hershberger, Yambupa, and Sanders. In this case, in order for this summary judgment to be overturned and the case sent back to the district court, Mr. Little needs to convince you that, number one, the officers violated a constitutional right. However bad the policing was, there was no constitutional right involved. Failure to perform a mandatory duty is not a constitutional right. If the officers showed up and it was clear that they had a basis to arrest, there was probable cause, it looked like the victim had been beaten up, and they basically say, you're good people because you're a police officer, we're not arresting you, you can keep doing this and leave, is that not unconstitutional? No. Why not? The decision to arrest is a discretionary act in California. So wouldn't that be increasing the danger to the victim? Well, as you aptly pointed out by a question, would the danger have been increased had they not shown up at all? But isn't communicating, if they walk in, if they do show up, so let's talk about Sanders. If Sanders shows up, and I know this isn't exactly the facts, but it's pretty close to the facts, so just take this for a second as a hypothetical. Sanders shows up, he sees the victim beaten up. He says, you're a police officer, so you can just keep doing this because I'm never going to arrest you, and he leaves. Hasn't that made it worse than if he never showed up at all? Well, under those facts, that may be true. However, those were not the facts that the officers were presented with that day. They arrived, the parties were outside, the parties were intoxicated, the parties were separated somewhat to be spoken to. Ms. Martinez wanted to stay at the residence. She did not want Mr. Pennington arrested. She wanted to stay. She did not beg to have him arrested. I think that's a misrepresentation of the record at that point. Well, we have to take the facts in the light most favorable to her at this stage, right? From the record, yes, not from counsel's argument. And she says they weren't separated. I mean, several of the things you just said I don't think are her version of the facts. Well, they were separated by a few feet. Okay, well, that's not very separated for hearing what someone is saying, is it, which is the relevant question? Well, I would agree with that. So that doesn't seem like they're separated. But, I mean, the point is there was at least Yambupa thinks that there's probable cause to arrest. And if Sanders says no because he's a police officer and we like his family, he's good people, we're never arresting him, which it seems like is basically what was communicated at that moment, why isn't that making things worse off for the victim? Because now her assailant has been told, do whatever you want to her. Well, I think this is a case that is like there was a case cited in the, is it the Hernandez case that Mr. Little brought up? It's called Patel, where a teacher did not supervise a little girl going to the restroom and she knew that there had been complaints about this little girl having trouble in the restroom and being unsupervised and she may have had learning disabilities. And the teacher knew this information and yet did not supervise her. But the court found in that situation, even with this little bit of knowledge, there was still not, she had not increased the danger to the little girl. There are lots of cases about inaction where doing nothing is not unconstitutional. But if Sanders stopped an arrest and communicated to the assailant, you can do whatever you want because you're good people, isn't that making things worse? Isn't that action rather than just inaction? I understand that that's the court's reading of those facts for purpose of this argument. However, that is not affirmative action, such as we have affirmatively directing the protesters a certain route where they are most certainly to be beat up. They had no choice. They were directed to go that way. And they wanted to take an alternate route through safety, and they were not allowed to do that. Ms. Martinez chose to go back into the home with Mr. Pennington. And the decision to arrest or not, whether it was a good decision or a bad decision, is more a negligence and duty issue and not a constitutional violation because it is a discretionary decision in California whether or not a peace officer is going to effectuate an arrest, even if he has probable cause. Is there any reason why we shouldn't announce a rule now that says that if a police officer stops an arrest when there was probable cause and communicates you can keep going with the assault because we're not going to arrest you, that that shouldn't be unconstitutional? Whether or not you should announce that rule now? I mean, let's say you're going to win this case because it's not clearly established, but is there any problem with that rule? Can you explain as a representative of police officers whether that would be a bad rule? Well, I think it would be a bad rule because that's going to automatically always create a question of fact between the two sides. Because the one side will always say, I heard that they were going to arrest the individual and said, no, we're not going to arrest them because they're bad people. And the other side will say the opposite. There will be no way for police officers to ever have qualified immunity if the Ninth Circuit were to announce a rule such as that. But those are not the facts here. Here you have an officer saying, I determined that he should be arrested and that there was a violation of a crime and I'm overruled by my sergeant. That's what we're talking about. People are not going to lie about something like that. I don't think you can assume that. Well, Yambupa was in a very regrettable situation because it was her supervisor and she was fairly new on the department, I think maybe about two years at that time. And she was following the order of her supervisor and they did have a discussion afterwards and the case was sent to the district attorney's office within that evening and Mr. Pennington was arrested within 24 hours. Yeah, and I'm glad that happened, but he should have been arrested on the scene. And what we're talking about is, what do you think about that? Do you think that's really going to have a negative effect on the police if that were the new rule going forward? As long as it's clearly communicated, then that is the rule that they would live by. And that is how we would train our officers and I'm sure that they would follow it. But that is not the rule now, so it is not a constitutional violation. But wouldn't it be a reasonable rule to tell officers that they shouldn't tell assailants it's okay to keep going with your assault? Would that be a reasonable rule? That would be the rule from the court and if it's the rule from the court, it would be reasonable. Well, Ms. Field, we don't want to push you into saying something that you think your clients don't want you to say, but this problem of domestic violence is a serious, serious issue. And we need to look at ways to try to protect people who don't always have the best judgment in their own lives. And that's why we require information be given to them, that they be separated from their abuser and be treated a certain way. And that just happened here. It is. It's a vicious cycle and I agree. And speaking as a female, I look at the facts and, you know, what happened to Ms. Martinez at the hands of Mr. Pennington was abhorrent. I agree. But when we're talking about was it a constitutional violation or was it just bad policing? Was it negligence? Was it a failure of a State duty? What we're looking at here is was it a constitutional violation for which these officers can be denied qualified immunity? And at this point, there is no case, there is no ruling, there is no law establishing that. And even if there was a constitutional violation, as pointed out by everybody who has briefed this case and the district court, there's only one case remotely similar, which is the Oken case. And the court went through great lengths at the summary judgment to say that he looked high and low for authority. He searched everywhere and this was the only one that he could find, but he could not say that that case was specific enough to resolve the debate so that the constitutional violation was established. And I also pointed out in my brief that the Oken case has been criticized and rejected by the Seventh Circuit. So we have a difference between the circuits here. So how can it be established law? How can it be clearly established under those circumstances? The one case that's remotely similar on the facts, and there's another circuit out there saying we reject this. And it's – it is a case in New York. We're talking about police officers here in California. And I would actually like to share a little anecdote with the court with regards to this proposition. Recently in California, down in Huntington Beach, we opened a new criminal justice training center, and it trains officers from 50 different agencies locally. And it opened on April 10th of 2018. The keynote address was given by Judge Bedsworth. And in part of his keynote address, and I think this speaks to the heart of qualified immunity and why it's so important to keep it for police officers, Judge Bedsworth said, every day, every time a cop picks up a paper or watches the news, he learns about something else he will have to know about probably before the end of his next shift. The amount of education and reeducation our police must assimilate every day is staggering. And that's true. We call upon our police officers – Didn't all of these police officers know that if you have a domestic violence assailant, know that the victim is making accusations and that if they communicate that the assailant can keep going, that they're increasing the danger? Did they all know that? I don't believe there was testimony to that. I mean, how is it possible that that's not just intuitive? It's just obvious, isn't it? Well, Your Honor, we're here talking about summary judgment and what is in the record. And I don't think their intuition is a part of the record. I mean, I don't think it's like a subtle point that domestic violence is likely to get worse in that situation. That's usually the way the cycle goes. And prior to that one occasion with Officer Yumbumpua and Sergeant Sanders, there had been a previous check-the-welfare call where Ms. Martinez was likewise uncooperative and even failed to return the call from the detective. And she alleges that that's the – I'm sorry? Well, she alleges that the officers kept her in front of Pennington at that time. And she had the opportunity to speak with the detective when he called privately, but she chose instead to share what happened to her with a friend who was a police officer that she had had a sexual relationship with, but telling him that she didn't want to file any kind of report. So I agree, these situations, they're abhorrent. But there has to be cooperation on the other side with the police. I think your co-counsel wanted some time. Yes. Thank you for reminding me. Thank you, Your Honors. Good morning. My name is John Phillips. I represent appellees Kim and Connie Pennington. On my very limited time, I'll address the dismissal by the District Court of the negligence cause of action, which was aimed at Kim and Connie Pennington. And I'll be as brief as I can. It was, as pled in plaintiff's complaint, it was set up under two very specific factual allegations. The first being that the abuse occurred in homes owned by Kim and Connie Pennington. The second, that Kim Pennington, as a volunteer police officer, owed a duty to her, to the plaintiff, and that he would therefore have exposure to the negligence cause of action. Both of those theories were dismissed on matters of duty by the District Court. As to the homes, it was shown without controversy that none of these homes were owned by our clients. Secondly, with respect to Mr. Pennington as a mandated reporter, that's a reference, I believe, to the California Law Canra Act, but that does not provide for a civil cause of action. The court looked at the general case law. Is there an allegation that Mrs. Pennington actually tried to prevent Martinez from calling the police, maybe by actually physically taking her phone? There is an allegation. There is a disputed allegation as to that. But I don't think the District Court ever got to that issue, Your Honor, because it decided it based on duty. So if you actually interfere with someone and take their phone, have you created a relationship that creates a duty? The limiting test is whether or not a special relationship has been created or a duty has been created by her actions. We know with respect to Mr. Pennington, he would have the duties applicable to a police officer, the public in general. It would seem to me the standard applicable to Mrs. Pennington, whether she owed the plaintiff a duty, would therefore be even lower. But it's a fact which was raised. It was a fact in dispute, but I believe the District Court never got there because the District Court decided it on grounds of duties. I think what you're being asked to do now, Your Honor, the plaintiff has really abandoned her arguments as to negligence as pled. What's being pled now and in the appellate briefs is a scenario that, well, if you look at the two general overall California statutes which talk about the duty not to harm another, and what you're being asked to do is in shotgun style go back and look at the totality of plaintiff's complaint and to craft a garden variety cause of action for negligence, which you believe should be stated. But as they set up their cause of action, very factually specific, the court dismissed it on grounds of duty. And I don't think it's the job of this court now to go back and scan the entire pleading under FRCP8 to put together a different cause of action than what they alleged. And I'll thank you and submit it unless there's questions. Thank you. Your Honor has mentioned a few points that I'd like to follow up on. First, we haven't discussed very much Judge Officer Hershberger today. Our position regarding her is the same as Officers Yambupa and Sanders. Perhaps not nearly as egregious as Officer Sanders, but if there is a substantive due process right, it should apply to those actions as well. I also wanted to follow up. I'm sorry, Your Honor. Could you identify what evidence there is of Sergeant Sanders' deliberate indifference? Sergeant Sanders' deliberate indifference is that he was, I believe, a 30-plus year peace officer. He was a supervisor. He was very well trained. What's his deliberate indifference? His deliberate indifference was he had an injured woman and an assailant in front of him where it had been announced that that person was going to be under arrest. And there's an inference that because of his personal relationship with the assailant's family, he not only negated that arrest, but he then reassigned the officer who wanted to do the arrest to write a report that day on an unrelated I'm sorry. He prevented her from writing the required same day report and had her do a transport assignment that effectively gave Mr. Pennington and his family 24 hours to work with to try to clean this situation up. And that was deliberate indifference? Yes, Your Honor. Why? Because it violates any number of policies and state laws which then can inform this Court as to what Officer Sanders' intention was. But he didn't deliberately indifferent. You just disagree with what he did. He wasn't deliberately indifferent, was he? He just he did something you felt was incorrect. But is that deliberate indifference? Your Honor, as in the Wood case and cases that have followed it, this Court has defined  an obvious risk of harm to the person and acting intentionally in disregard for that risk. And I think that's precisely what Sergeant Sanders did. Okay, thanks. I think you're out of time, so thank you both sides for the helpful arguments. The case is submitted and we are adjourned for the day.
judges: Wallace, Friedland, Lasnik